NOTICE

Decision filed 02/18/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240920-U

NO. 5-24-0920

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* COMMITMENT OF DAVID MACKEL | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Madison County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 00-MR-154 |
| | ) | |
| David Mackel, | ) | Honorable |
| | ) | Timothy D. Berkley, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Moore and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court did not err in finding that there was no probable cause for an evidentiary hearing on the issue of whether the respondent remained a sexually violent person, and since no argument to the contrary would have merit, the respondent's appointed appellate counsel is granted leave to withdraw as counsel, and the judgment of the circuit court is affirmed.

¶ 2    This appeal stems from a civil action that was brought pursuant to the Sexually Violent Persons Commitment Act (SVP Act) (725 ILCS 207/1 *et seq.* (West 2022)). Years ago, the circuit court determined that the respondent, David Mackel, was a sexually violent person (SVP) as defined under section 5(f) of the SVP Act (see *id.* § 5(f)) and committed him for institutional care in a secure facility (see *id.* § 40(b)(2)). On July 29, 2024, the court found that there was no probable cause to warrant an evidentiary hearing on the issue of whether the respondent was no longer an

1

SVP, thus maintaining his commitment status. The respondent now appeals. His appointed counsel on appeal has concluded that the instant appeal is wholly frivolous. On that basis, counsel has filed with this court a motion to withdraw as counsel, along with a brief in support thereof, citing *Anders v. California*, 386 U.S. 738 (1967). Counsel gave proper notice to the respondent. This court then gave the respondent ample opportunity to file a *pro se* brief, memorandum, etc., explaining why this appeal has merit or why appointed counsel should not be allowed to withdraw, but the respondent has not filed any type of response with this court. A careful examination of the *Anders* motion and brief, as well as the relevant portions of the record on appeal, reveals that this appeal is, indeed, wholly frivolous. Appellate counsel must be granted leave to withdraw, and the judgment of the circuit court must be affirmed.

¶ 3                                    BACKGROUND

¶ 4     In 1997, in Madison County case No. 97-CF-1841, the respondent pleaded guilty to aggravated criminal sexual abuse and was sentenced to imprisonment in the Illinois Department of Corrections (DOC) for five years. At the time of the offense, the respondent was 29 years old; his victim was a 15-year-old boy, whose penis the respondent had fondled. The respondent's criminal history included two prior convictions for sex offenses, also against adolescents, with sentences of probation imposed. Shortly before his scheduled release from imprisonment in case No. 97-CF-1841, and more specifically in March 2000, the Illinois Attorney General, on behalf of the State, filed a petition alleging that the respondent was an SVP. See 725 ILCS 207/15(a) (West 2000). The SVP petition alleged that the respondent had been convicted of aggravated criminal sexual abuse in case No. 97-CF-1841. It alleged that he had two mental disorders, *viz.*: (1) paraphilia, not otherwise specified (NOS), sexually attracted to adolescent males and females; and (2) personality disorder, NOS, with antisocial features. Finally, it alleged that he was

dangerous to others because his mental disorders created a substantial probability that he would engage in acts of sexual violence. See *id.* § 15(b).

¶ 5     Trial counsel was appointed for the respondent. See *id.* § 25(c)(1). Years passed before the petition was heard and adjudicated.

¶ 6     In November 2006, after a two-day trial on the SVP petition, the circuit court entered an order finding that the respondent was an SVP, and it entered judgment on that finding. See 725 ILCS 207/35(f) (West 2006). An initial commitment order was entered. See *id.* § 40(a). However, the court thought that it lacked sufficient information to determine whether to commit the respondent for institutional care in a secure facility or for conditional release, and therefore it ordered the Department of Human Services (DHS) to conduct a predisposition investigation and a supplementary mental examination. See *id.* § 40(b)(1). In April 2008, following a hearing held across two days, the court entered a written order committing the respondent to DHS for institutional care in a secure facility. See 725 ILCS 207/40(b)(2) (West 2008).

¶ 7     Since the April 2008 commitment order, there has been no change in the respondent's commitment status. In accordance with the SVP Act, DHS, at least once every 12 months, has had a licensed clinical psychologist reexamine and reevaluate the respondent and submit to the circuit court a written report on the respondent's mental condition. See 725 ILCS 207/55(a), (b) (West 2022). Each of these periodic reexaminations has ended in the same way—with the psychologist's opining, to a reasonable degree of psychological certainty, that the respondent had not made sufficient progress in treatment to be conditionally released and that the respondent's condition had not so changed that he was no longer an SVP.

¶ 8     A thorough review of the record on appeal does not indicate that the respondent ever has petitioned the circuit court to modify its commitment order by authorizing his conditional release.

3

See *id.* § 60(a). Such a review also does not reveal that the respondent ever has petitioned for discharge from the custody of DHS. See *id.* § 65(a)(1), (b)(1). In other words, he has not sought to alter or to end his commitment through the statutorily established procedures.

¶ 9    The circuit court has held a probable-cause hearing each year. Consistently, it has found, after reviewing the psychologist's reexamination report, that there was no probable cause to believe that the respondent's condition had so changed that he was no longer an SVP requiring institutional care in a secure facility. See *id.* § 65(b)(1).

¶ 10    In May 2024 came the reexamination that is at the center of the instant appeal. Amy S. Louck Davis, a licensed clinical psychologist, conducted the latest periodic reexamination of the respondent, and she submitted to the circuit court the latest written report on the respondent's mental condition. (Louck Davis had been conducting the respondent's periodic reexaminations, and had been submitting reports on his condition, each May since 2017.) For her latest report, she interviewed the respondent, via videoconferencing, for one hour. She reviewed his past psychological evaluations, his reexamination reports, his file records from DHS and DOC, and she completed two static, actuarial assessments of him.

¶ 11    At the start of the video interview, Louck Davis obtained the respondent's oral consent to participate in the interview. The respondent indicated that he wished to retain his right to petition the circuit court for a discharge from the custody of DHS, *i.e.*, he did not affirmatively waive that right. During the interview, the respondent acknowledged that he had not been participating in treatment, but he stated that the treatment was not specific to sex offenders and therefore was useless to him, and that the treatment he received in DHS was the subject of a lawsuit he had filed.

¶ 12    In her written report to the court, Louck Davis explained that the treatment program at DHS has five phases, *viz.*: assessment, accepting responsibility, self-application, incorporation, and

4

transition. She indicated that the respondent "initially participated in the treatment program," completing the first phase and advancing to the second. However, this treatment success apparently was in the early years of the respondent's commitment to DHS; his treatment had become stalled, and was stalled, due to his own choice. "During the current review period, [the respondent] did not participate in treatment," Louck Davis wrote. "Treatment staff meet with him quarterly to discuss returning to treatment. Records indicated such meetings occurred on May 31, 2023, August 30, 2023, and November 29, 2023. [The respondent] reportedly stated he would return to sex offense specific treatment if he were allowed to change to a different treatment team, since he perceived the assigned team to discriminate against him because they would not allow him to chose [*sic*] his roommate."

¶ 13    Based on the respondent's written records and his interview, Louck Davis wrote that she had formed an opinion, to a reasonable degree of psychological certainty, that the respondent met the criteria for three disorders contained in the Diagnostic and Statistical Manual of Mental Disorders, Text Revision (5th ed. 2013). These three disorders were (1) other specified paraphilic disorder, nonexclusive type, nonconsent, in a controlled environment; (2) other specified personality disorder, with antisocial and narcissistic features; and (3) substance use disorder, in a controlled environment. In regard to the first of these three disorders, Louck Davis explained that a paraphilic sexual interest includes a sexual interest in nonconsenting persons or in immature or especially vulnerable individuals, and she noted that he "was convicted of sexual offenses against individuals too young to consent and used grooming and manipulation tactics, including substances, to gain compliance in sexual offending." In regard to the second of these disorders, Louck Davis wrote that "[t]he essential feature of Antisocial Personality Disorder is a pervasive pattern of disregard for, and violation of, the rights of others since the age of 15." His antisocial

5

traits included denying or minimizing his sexual offenses, and his narcissistic traits included having "little remorse for the victims of his sexual offenses."

¶ 14    According to Louck Davis, research showed that "unguided clinal judgment on its own" was the least effective method of predicting recidivism. Louck Davis therefore "employed an actuarial approach AND also considered additional empirically-based known risk factors to determine [the respondent's] level of risk." The actuarial assessment instruments that she used with the respondent were the Static99R and the Static 2002R. On the Static99R, the respondent scored a 5, placing him in the second-highest of the five risk categories. His score of 5 "is associated with an 18% to 24.8% sexual recidivism risk over five years and 26.7% to 37.9% sexual recidivism risk over 10 years. *** Sex offenders with the same score as [the respondent] are expected to be 2.7 times more likely to sexually reoffend as the typical sex offender (defined as a median score of 2). [The respondent's] score of 5 is higher than 85% of sex offenders in the sample." On the Static 2002R, the respondent scored a 6, which was "associated an 18.9% to 27% sexual recidivism risk over five years." The score was "higher than 84.8% of sex offenders in the sample."

¶ 15    In addition to these actuarial measures of relative risk for sexual recidivism, Louck Davis wrote, meta-analyses of data have identified several other risk factors with "significant correlations with recidivism." These risk factors are dynamic, not static, and they have "no specific cut-off numbers" assigned to them, but the greater the number of risk factors present, the more likely a person is to sexually reoffend. Here, the respondent exhibited 10 of these dynamic risk factors, according to Louck Davis, ranging from "general people problems" to "attitudes tolerant of sexual crimes." A sexual offender can lower his risk of recidivism through the successful completion of

6

sexual offense specific treatment, Louck Davis noted, but the respondent "has not successfully completed sex offense specific treatment. As such, no reduction in risk is warranted."

¶ 16    Louck Davis concluded, to a reasonable degree of psychological certainty, that (1) the respondent's condition had not changed since his previous reexamination, and he continued to meet the criteria for an SVP, and (2) the respondent had not made sufficient progress in treatment to be conditionally released, and he should remain committed to DHS for secure care and sexual offense specific treatment.

¶ 17    In reaction to Louck Davis's latest reexamination report from May 2024, the State, by the attorney general, filed a motion for the circuit court to conduct a probable cause hearing. The State wanted the court to consider the reexamination report, as well as the arguments of the parties' attorneys, and for the court ultimately to make a finding that there was no probable cause to believe that the respondent was no longer an SVP.

¶ 18    On July 29, 2024, the circuit court held a probable cause hearing. See 725 ILCS 207/65(b)(1) (West 2022). An assistant attorney general and an attorney who represented the respondent were present, though the respondent himself was not present. See *id.* The assistant attorney general stated that the respondent had not participated in treatment but otherwise stood on the motion for a finding of no probable cause. The respondent's attorney argued briefly that the respondent "has been trying to participate in treatment and he has maintained for years now that they're denying him any meaningful treatment, any sex offender specific treatment." The attorney asked the court to appoint an "expert" to "explore his treatment options." The court stated that a review of Louck Davis's report concerning her 2024 reexamination of the respondent showed that there was "no probable cause to warrant an evidentiary hearing" to determine whether the respondent was still an SVP in need of inpatient treatment in a secure facility.

7

¶ 19    The respondent filed a timely notice of appeal from this order. He thus perfected the instant appeal.

¶ 20                                    ANALYSIS

¶ 21    This appeal is from the circuit court's order finding that there was no probable cause to warrant an evidentiary hearing on the issue of whether the respondent's condition had so changed that he was no longer an SVP. This court reviews this determination *de novo*. *In re Commitment of Wilcoxen*, 2016 IL App (3d) 140359, ¶ 28. As previously noted, appointed appellate counsel has concluded that this appeal is without arguable merit. This court agrees with counsel.

¶ 22    "The purpose of the SVP Act is to identify sexually dangerous persons and to force them into treatment for their own good and for the safety of society." *In re Commitment of Gavin*, 2014 IL App (1st) 122918, ¶ 75. Proceedings under the SVP Act begin when the State, whether through the Illinois Attorney General or a state's attorney, files in the circuit court a petition alleging that a particular person (1) has been convicted of a sexually violent offense, (2) has a mental disorder, and (3) is dangerous to others because the mental disorder creates a substantial probability that the person will engage in acts of sexual violence. 725 ILCS 207/15(a), (b) (West 2022). These proceedings are civil in nature. *Id.* § 20.

¶ 23    The circuit court must review the State's petition. If the court finds cause to believe that the person is eligible for commitment under the SVP Act, it must issue an order for detention of the person. *Id.* § 30(a). The court must hold a hearing to determine whether there is probable cause to believe that the person is an SVP, and if the court determines that probable cause exists, it must order that the person be taken into custody, if he or she is not already in custody. *Id.* § 30(b), (c). A trial must be held, whether by the court or by a jury, with the State having the burden of proving beyond a reasonable doubt the specific allegations in the petition, and if the court or jury

8

determines that the person is an SVP, the court must enter judgment on that finding. *Id.* § 35. At that point, the court must order that the person be committed to the custody of DHS until such time as he or she is no longer an SVP, and the court must hold a hearing in order to determine whether the commitment should be for institutional care in a secure facility or for conditional release. *Id.* § 40.

¶ 24    At least once every 12 months after commitment, DHS must periodically reexamine the committed person and promptly furnish the court with a written report on his mental condition. *Id.* § 55(a), (b). The purpose of these periodic reexaminations is to determine whether the committed person has progressed enough to be conditionally released or discharged. *Id.* § 55(a).

¶ 25    At the time of each reexamination, the committed person receives notice of his right to petition the court for discharge. *Id.* § 65(b)(1). This notice must include a waiver of rights. *Id.* If the committed person does not file a petition for discharge, but he does not affirmatively waive his right to file one, the court must conduct a probable cause hearing to determine if facts exist to warrant a hearing on the issue of whether respondent remains an SVP. *Id.* The probable cause hearing consists only of the court's review of the reexamination reports and the arguments of the parties. *Id.* The committed person has the right to an attorney at the probable cause hearing, but he is not entitled to be present at that hearing. *Id.* If the court finds probable cause to believe that the person has so changed that he is no longer sexually violent, the court must set a hearing on the issue, at which the State has the burden of proving by clear and convincing evidence that the person remains sexually violent. *Id.* § 65(b)(2). However, if the court finds no probable cause to believe that the committed person is no longer sexually violent, the matter ends in the circuit court, and the committed person is free to appeal.

¶ 26    Here, at the respondent's probable cause hearing, as at every SVP's probable cause hearing, the sole question was whether facts exist to believe that since the most recent periodic reexamination, the condition of the SVP has so changed that he was no longer an SVP. See *id.* § 65(b)(1). In a case like the respondent's, where he did not file a petition for discharge but also did not waive his right to file one, the probable cause hearing consisted only of a review of the reexamination report and the arguments on behalf of the parties. *Id.* Here, in the latest reexamination report on the respondent, in May 2024, Louck Davis determined, to a reasonable degree of psychological certainty, that the respondent still qualified as an SVP. She further found that since his reexamination in May 2023, he had not done anything, in terms of treatment, to change his condition. According to her actuarial assessments, the respondent ran a substantially higher risk of sexual recidivism, relative to other sex offenders, and this prediction was supported by her clinical judgment. The respondent's failure to participate in treatment did nothing to reduce his risk of reoffending. In light of Louck Davis's professional findings and expert opinions, it is no wonder that the circuit court found a lack of probable cause to believe that the respondent was no longer an SVP. Appointed appellate counsel summarizes the situation nicely: "The reexamination report is devoid of any facts showing respondent's conditions and risk had changed during the reexamination period at issue." There was no error in the court's determining that there was no probable cause to warrant an evidentiary hearing on the issue of whether the respondent was no longer an SVP.

¶ 27                              CONCLUSION

¶ 28    Where the circuit court's judgment was not in error, and any argument to the contrary would be wholly frivolous, this court grants appointed appellate counsel's motion to withdraw and affirms the judgment of the circuit court.

10

¶ 29    Motion granted; judgment affirmed.